Edith Worthen, Administratrix of Estate of Lyman A. Worthen, Deceased, Appellant, v. Guy A. Thomson, Trustee, Missouri Pacific Railroad Company, Appellee.

Gen. No. 44,516.

Opinion filed March 13, 1951. Released for publication April 6, 1951.

JAMES A. DOOLEY, of Chicago, for appellant.

CAMPBELL, CLARK & MILLER, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Edith Worthen, administratrix of the estate of Lyman A. Worthen, deceased, brought suit under the Federal Employers' Liability Act to recover damages for the death of the intestate. Trial by jury resulted in a verdict for defendant. Plaintiff's motion for a new trial was denied, judgment was entered on the verdict, and plaintiff filed an appeal which was docketed in the October term of 1948. Since then the parties periodically stipulated for extensions of time for the filing of abstracts and briefs, and the cause was not ready for consideration until January 1951.

From the salient facts as related in defendant's brief and documented by record references, it appears that at the time of his death Lyman Worthen had been regularly employed by the defendant railroad for some eighteen years. He lived at Gorham, Illinois, which is south of East St. Louis and near the Mississippi River, was married and the father of five children, but had been separated from his wife for about seventeen months at the time of his death, and was contributing support under a court order. His duties were those of a service repairman in the water-service department of the railroad's Illinois Division, of which his

father, A. Logan Worthen, had been foreman for many years. On April 30, 1946, a crew of five service repairmen, with decedent in charge, were repairing a coal chute at Gale, Illinois, thirty-six miles south of Gorham. Decedent and his helper, Qualls, had left Gorham for work about 7:30 A.M. in a railroad motor car which ran on the tracks and was powered by a gasoline engine. Owen Lunsford and his helper, Crowell, had also come to work on a motor car, but the other members of the crew came to Gale by automobile.

The working day of the crew extended from 7:30 A.M. to 4:00 P.M., with time off for lunch. On the day of the accident the men worked until approximately 4:00 P.M., at which time decedent directed them to come back to the same job the following day. He told Qualls that he should be at Gale "by work time in the morning," that he (Worthen) was not going home that night, and accordingly Qualls returned to his home by automobile with some of the other men in the crew. Lunsford and Crowell went back to Gorham by motor car, arriving there a little after five in the afternoon, while it was still light. Decedent went on his motor car in the opposite direction to Fornfelt, Missouri, which adjoins the town of Illmo, Missouri, about five miles from Gale. The track used by decedent crosses a bridge over the Mississippi River between Gale and Illmo. The track across the river, beginning at a point south of Gale and running to Illmo, is not owned by the defendant railroad, but by a bridge company, and the track from Illmo to Fornfelt is owned by the Cotton Belt Route.

At about 4:30 P.M. in Fornfelt decedent met a young woman, Lola Summers, as she left a bus which she had taken from the factory where she worked. They walked to her house where they stayed only a few minutes; then Miss Summers accompanied him to the

railroad tracks to see him off. He took the motor car and proceeded north toward Illmo. Toward 7:00 P.M. decedent stopped at Halsey Tower, a signal station maintained by defendant railroad, located about ten to twelve miles south of Gorham. From Halsey to Howardton Crossing, a distance of five miles, the railroad runs a single track, while the five-mile run from Howardton to Gorham is covered by a double track. Decedent talked to J. L. Parks, a railroad telegrapher in the tower at Halsey, and asked him for the line-up of southbound trains. He remained in the signal station twenty to thirty minutes, and talked to Parks in connection with a train coming from the north and the possibility of his reaching Howardton before the train came off the double track onto the single track south of Howardton. While he was there Parks talked on the telephone with Robert Lunsford, a signal maintainer on the railroad, who was repairing a defective signal. Decedent left with a red oil lantern.

About 6:00 P.M., Robert Lunsford had been called to repair a signal located approximately seven miles south of Gorham. He went there on a motor car after he had obtained a line-up of trains, reached the signal about 7:00 P.M., repaired it, and then proceeded north. For a mile north of Howardton the road has a third track in the center called a passing track, and when Lunsford reached the north end of the passing track he noticed a signal which remained red when it should have been yellow. After checking it he found it necessary to go back south a half mile to pick up a battery in order to restore the signal to its normal position, and had traveled only a short distance south when his motor car collided with the one driven by decedent. The accident occurred shortly after eight on a dark stormy night. Both cars were on the east track. Each car was equipped with a windshield which was made of canvas supported by a frame, the canvas extend-

ing about eighteen inches above the frame. Lunsford's windshield was at the north end of his car, at his back, as he traveled south. Decedent's windshield was at the north end of his car. It was the south end of Lunsford's car and the north end of decedent's car that collided.

At the time of the collision Lunsford was sitting on the left side of his car, facing south, while the car was going south. Two red fusees were burning on his car, one on each side, and on his left arm he carried an electric lantern that threw light in a southerly direction as he proceeded south. He had no oil lantern on the car. He was looking down the track, but did not see decedent's motor car coming. Witnesses testified that fusees burn for about ten minutes with a red flame and bright light which can be seen for about half a mile on such a night.

Recovering consciousness after the collision, Lunsford heard someone making a noise, located him and recognized decedent, but was unable to help him because of his own exhaustion. By that time a Cotton Belt Route train was coming north on the same track, and he walked toward it and stopped it with a lighted fusee. A southbound Missouri Pacific train also came on the scene on the west track and stopped. Lunsford and decedent were taken to Gorham on the northbound Cotton Belt Route train, and it was stipulated that decedent died as a result of the injuries received in the collision.

Safety rules of the defendant railroad were offered in evidence, and the parties stipulated that decedent had received a copy of the rules and had passed examinations with respect to them. These rules provide for display of red lights at night, forbid motor cars to be run on foreign lines unless authorized by the proper officials, and limit the use of cars to railroad business by employees in the discharge of their duties.

Some fourteen witnesses testified for plaintiff, and nine for defendant. Their testimony with respect to practices or customs in connection with operating cars on the railroad is not entirely in accord. With respect to the return of the motor cars to headquarters, there is evidence that it was the duty of a water-service repairman to take the car to work and return it. Some of plaintiff's witnesses stated on direct examination that there was no rule that the car should be returned to headquarters at Gorham by a definite hour. On cross-examination, one of them testified that if they were working reasonably close to Gorham, they had a choice of staying all night near the point of work or returning that night to Gorham. Two of the witnesses said on cross-examination that if they were returning to Gorham, they were expected to return within the eight-hour working day, unless an emergency arose. For defendant, decedent's father, A. L. Worthen, the water-service foreman, testified that the men had been instructed orally to be back at headquarters before quitting time if they expected to return that night, and that he had given such instructions to decedent prior to the accident. The men were paid straight time for an eight-hour working day which included their time in going to and from work.

At defendant's request a special interrogatory was submitted to the jury which, together with the answer thereto, was as follows: "Q. Do you find from the evidence that at the time of the accident in question on the evening of April 30, 1946, Lyman Worthen was discharging the duties of his employment or doing some act necessarily incident to his employment? A. No." In instruction No. 7 offered by defendant, the jury were told in similar language that plaintiff, in order to recover, must prove that decedent at the time of the accident "was discharging the duties of his employment or was performing an act which was

necessarily incident to his employment." Plaintiff takes the position that decedent was "in the defendant's employ as a matter of law," but it is urged, without receding from that contention, that even though that were a question of fact for the jury, they were misled by the special interrogatory and instruction into believing that an employee en route home could not be discharging the duties of his employment or doing some act necessarily incident thereto; in other words, the criticism is that neither the interrogatory nor the instruction was cast in the language of the statute which would require only that the decedent had been in the employ of the interstate carrier, and plaintiff's counsel argues that, under the decisions cited in his brief, an employee injured or killed on his way to or from work is held to be "employed by such carrier in such commerce," as provided in the Act, and therefore entitled to recovery.

 With respect to the forepart of this contention, we think the proposition whether decedent was at the time of the accident in the employ of the railroad, was purely a question of fact for the jury. Since the Act imposes liability on a carrier only as to "any person suffering injury while he is employed" by the carrier in interstate commerce, it was of course incumbent on plaintiff to prove that decedent was at the time of the collision so employed. Defendant's answer alleged that he was not "at the time of the occurrences mentioned in plaintiff's complaint an employee of the defendant, acting within the scope of his employment," within the meaning of the Act, thus joining issue upon the essential ultimate fact in the case. The trial produced evidence from which the jury could reasonably infer that decedent was not in the employ of the railroad at the time of the injury. About four hours elapsed between the time he quit work and the time his motor car collided with that of Lunsford. During

that interval the other members of the crew had returned to Gorham, whereas decedent had gone on a personal errand into another state, over tracks not owned by defendant. Defendant had a right to have these circumstances submitted to the jury. Recent Federal Employers' Liability Act cases decided by the United States Supreme Court emphasize that where the evidence or the conclusions therefrom are in dispute, the inferences to be drawn from the evidence are matters for the jury. In *Tiller v. Atlantic Coast Line R. Co.,* 318 U. S. 54, it was said Congress intended "that, to the maximum extent proper, questions in actions arising under the Act should be left to the jury," and in *Tennant v. Peoria & P. U. Ry. Co.,* 321 U. S. 29, the court pertinently observed that "the very essence of its [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable," and that "courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." See also *Lavender v. Kurn,* 327 U. S. 645, to the same effect. In *Avance v. Thompson,* 387 Ill. 77, the trial judge had instructed the jury that the employee was engaged in interstate commerce at the time of the accident, a question on which an issue of fact existed. The Supreme Court reversed the judgment, holding that "the rule laid down is that where the facts are in dispute, or more than one inference can be drawn from them, the question whether the injured employee was at the time in interstate commerce is a question for the jury." We perceive no reason why the same rule should not apply to the question of the injured person's employment in the case at bar.

■ With respect to the language in which the special interrogatory and instruction No. 7 were cast,

69

we find numerous federal decisions wherein similar phrases (''a necessary incident of his day's work'' (*Erie R. Co. v. Winfield,* 244 U. S. 170), ''those things necessarily incident thereto'' (*Virginian Ry. Co. v. Early,* 130 F. (2d) 548), ''an incident of it [the injured person's employment]'' (*New York Cent. R. Co. v. Marcone,* 281 U. S. 345)) were used in discussing whether or not an injured person was employed at the time of the injury. We are not unmindful of the fact that in some of the cases cited by plaintiff an employee enroute home was held to be in the course of his employment and allowed to recover, even though not then performing a duty of his employment or not doing an act necessarily incident to it; but in most of those instances the injured person was either going to or returning from his job without any such social diversion as appears in the case at bar. It is readily conceivable that under the circumstances of a particular case a trip home or a part of it was a ''necessary incident'' of the employment, but that would only constitute evidence from which a jury could find employment. In the case at bar we think it would have been error for the court to instruct the jury that the decedent was employed simply because he was en route home. If the interrogatory and instruction had specifically used the wording of the Act, ''while he is employed by such carrier in such commerce''—the language for which plaintiff contends—it would have limited rather than enlarged the circumstances under which plaintiff could recover, since the jury might then have thought that the railroad was liable only if the employee was actually doing his work as a water-service repairman at the time of the accident. The interrogatory and instruction clearly indicated that the railroad was also liable if decedent was discharging a duty of his employment or was doing something that was a necessary incident of it. Consequently, the

70

language used was more beneficial to plaintiff than the general language of the statute would have been. This, as defendant suggests, may account for the fact that plaintiff's counsel made no objection to the wording of the special interrogatory, but instead argued at length that decedent at the time of the occurrence was discharging the duties of his employment or doing some act necessarily incident thereto, and not until after there had been an adverse verdict, and on motion for a new trial, did plaintiff claim for the first time that the language of the interrogatory was misleading. If a valid objection had been made, the language could undoubtedly have been changed.

■ Section 65 of the Civil Practice Act (Ill. Rev. Stat. 1949, ch. 110, par. 189) [Jones Ill. Stats. Ann. 104.065] provides as follows: "In any case in which the jury render a general verdict, they may be required by the court, and must be required on request of any party to the action, to find specially upon any material question or questions of fact which shall be stated to them in writing, which questions of fact shall be submitted by the party requesting the same to the adverse party before the commencement of the argument to the jury. Submitting or refusing to submit a question of fact to the jury when requested by a party, as above provided, may be excepted to and be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former shall control the latter and the court may render judgment accordingly." The plain intent of this section of the statute requires an exception in the case of a special interrogatory. But even in the earlier cases it was generally held in this state that objections to special interrogatories must be made when submitted, and not for the first time on a motion for a new trial. *Staff v. Chicago, M. & St. P. Ry. Co.*, 79 Ill. App. 295 (memorandum

opinion); *Dickinson v. Atkins,* 100 Ill. App. 401; and *Ogilby v. Schmauss,* 321 Ill. App. 161, 52 N. E. (2d) 293 (Abst.), wherein the North Eastern Reporter headnote states that "where no objection was interposed to giving of special interrogatory to jury when read, no complaint thereof could be made upon appeal." It is also the settled rule that an objection to a defect which may be cured or obviated must be made in sufficient time to remedy the claimed defect. *Logan v. Mutual Life Ins. Co.,* 293 Ill. 510; *Sweney v. Northwestern Mut. Life Ins. Co.,* 251 Ill. App. 1.

 The remaining ground for reversal relates to the alleged negligence of defendant. We have carefully examined the record and have heretofore stated the evidence substantially as it appears. There is certainly no basis for plaintiff's contention that defendant's negligence was proved as a matter of law. The evidence was fairly against any finding that defendant's servants were negligent. At most it was for the jury to determine whether there was any evidence from which they could reasonably infer and conclude that defendant's servants were guilty of negligence. The circumstances with reference to lights, signals, weather, traffic and other matters were fully developed upon the trial, and were undoubtedly considered by the jury in reaching their conclusion. Under the facts of this case the jury were fully justified in their verdict, and the judgment entered on the verdict was proper. It should therefore be affirmed, and it is so ordered.

*Judgment affirmed.*

SCHWARTZ, P. J., and SCANLAN, J., concur.