Anna Lee Lipscomb, Individually and as Administratrix of the Estate of Judge Lipscomb, Deceased, Appellee and Cross-Appellant, v. Albert Coppage, et al.

On Appeal of Harry S. Feldman.

Gen. Nos. 48,983, 49,003.

First District, Third Division.

November 27, 1963.

Ordered published in full March 23, 1964.

Brody and Gore, and Robert B. Johnstone, of Chicago, for defendant-appellant.

David Alswang and Samuel S. Siegel, of Chicago (David Alswang, of counsel), for plaintiffs-appellees.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken by Harry S. Feldman, defendant, from two judgments entered after a trial before a jury in the Superior Court of Cook County.

Anna Lee Lipscomb, individually and as administratrix of the estate of Judge Lipscomb, deceased, sued the defendant for damages due to the wounding of

Anna Lee Lipscomb and the death of Judge Lipscomb as a result of a shooting by one Albert Coppage, a part-time bartender employed by defendant Feldman. The trial court entered judgments in favor of the plaintiff individually and as administratrix on the verdicts of the jury. Each of the judgments was in the sum of $10,000. The jury also returned a verdict in favor of Harry S. Feldman and against Anna Lee Lipscomb, as administratrix and also individually, on count one of the complaint, which asserted claims under the Dram Shop Act. The court entered judgment in accordance with that verdict. The plaintiff, as administratrix and in her individual capacity, has taken a cross-appeal from that judgment of the court. The plaintiff in her dual capacity also filed in the trial court a motion, supported by affidavit and suggestions, asking the court to fix and tax reasonable attorney's fees in favor of the plaintiff and against the defendant in accordance with section 41 of the Practice Act, on the ground that the defendant, without reasonable cause and not in good faith, made a denial of plaintiff's allegation that the death of Judge Lipscomb resulted from the alleged assault upon him by Coppage. The court denied this motion, and the plaintiff also appealed from this order in her cross-appeal.

We will first consider the cross-appeal of the plaintiff. That cross-appeal is based upon the judgment of the court on count one of the complaint filed against the defendant by the plaintiff both in her individual and representative capacities. The court entered judgment on May 10, 1962. The defendant on July 25, 1962 filed a notice of appeal from the judgments of the court on count three of the complaint. On August 15, 1962 the plaintiff filed her notice of appeal from the judgment on count one. While we have considerable doubt as to whether the cross-appeal filed by the plaintiff is in accordance with rule 35 of the Supreme

430b

Court, no motion was made to dismiss the cross-appeal and we will consider the appeal on its merits. (See Heine v. Degen, 362 Ill 357, 199 NE 832; First-Trust Joint Stock Land Bank of Chicago v. Cutler, 286 Ill App 6, 2 NE2d 758.)

█ Count one of the complaint as amended was an action brought under the Dram Shop Act (Ill Rev Stats c 43, § 135). The theory of the plaintiff in this court is that Albert Coppage was served liquor in the tavern of the defendant, which caused in whole or in part his intoxication, and while in that condition he shot Judge Lipscomb inflicting wounds from which he died, with resulting injury to the plaintiff's means of support. At the conclusion of the evidence two specific interrogatories were submitted to the jury by the court upon the motion of the defendant. Both of the interrogatories applied to count one of the complaint. The interrogatories and answers were as follows:

> Does the jury find from the evidence that at the time and place of the incident complained of Albert Coppage was intoxicated. Answer: No.
> Does the jury find from the evidence Harry S. Feldman or his agent sold or gave alcoholic liquor to Albert Coppage. Answer: No.

The jury returned a verdict on count one for the defendant and against the plaintiff. The court entered judgment on the verdict. The plaintiff filed a post-trial motion in which she set out, among other things, that the verdict was against the weight of the evidence and that the court erred in instructing the jury. In that motion she further stated that the court had erred in its rulings on evidence during the progress of the trial. In the motion none of the instructions objected to are set out in full. In neither the abstract filed by the defendant nor in the supplementary abstract filed by the plaintiff are all the instructions

430c

given abstracted, and the conference of the court on the instructions, if held, does not appear in the record. In the post-trial motion of the plaintiff the only reference to the special interrogatories is that "the Court erred in submitting the Special Interrogatories to the jury on behalf of the defendant, Harry S. Feldman."

In order for the plaintiff to recover on count one of the complaint it was necessary for her to prove to the satisfaction of the jury that at the time her husband was shot Coppage was intoxicated and his intoxication resulted from liquor either sold or given to him by the defendant. The plaintiff in her post-trial motion alleges that the verdict is against the weight of the evidence, but nowhere in that motion does she state that the answers returned by the jury to the special interrogatories were against the weight of the evidence. It is elementary law that where a general verdict is returned and special interrogatories are answered, the answers to the special interrogatories control the general verdict. In Biggerstaff v. New York C. & St. L. R. Co., 13 Ill App2d 85, 141 NE2d 72, we said:

"The plaintiff argues that the verdict was against the manifest weight of the evidence and that the answers to the special interrogatories were not responsive to the evidence. In his motion for new trial the plaintiff calls attention to the giving of the three interrogatories and only says that the court erred in submitting them to the jury. He made no motion to strike the answers to the interrogatories, nor did he allege that they were contrary to the manifest weight of the evidence, though in the motion he did urge that the verdict was contrary to the manifest weight of the evidence. In Forslund v. Chicago Transit Authority, 9 Ill App2d 290, we held that where a

430d

finding is substantially conclusive of the fact upon which the issue of liability depended and the defendant had failed to object to the answer to the interrogatory in the motion for new trial, the reviewing court must consider the special findings to have been fully sustained by the evidence and in support we cited Voight v. Anglo-American Provision Co., 202 Ill 462; Weinrob v. Heintz, 346 Ill App 30; Brant v. Chicago & Alton R. Co., 294 Ill 606; and Brimie v. Belden Mfg. Co., 287 Ill 11. In Rubottom v. Crane Co., 302 Ill App 58, the court said: 'Under the authorities there are several ways by which a party may escape from being conclusively bound by the special finding of a jury: (1) by specific objection to the special finding on the motion for a new trial, or (2) by filing a specific motion to set aside the special finding when the motion for a new trial is made."

The answers to the interrogatories control the general verdict and negate the claim of the plaintiff for relief under the Dram Shop Act.

 The plaintiff has in her post-trial motion objected to the submission of the interrogatories. In the record before us there is no showing that any objection was made at the time when the interrogatories were submitted. Without an objection appearing in the record we could under no circumstances consider the point urged by the plaintiff. Weinrob v. Heintz, supra; Worthen v. Thomson, 343 Ill App 62, 98 NE2d 142. Nor can we consider any objections purportedly made in the post-trial motion by the plaintiff with reference to instructions. Unless the objection to instructions is made at the conference on instructions any alleged error cannot be reviewed. Saunders v. Schultz, 20 Ill2d 301, 170 NE2d 163; Seaquist v. Alexander, 34 Ill App2d 8, 180 NE2d 213.

430e

The trial court committed no error in denying plaintiff's post-trial motion as to count one of the complaint as amended. The judgment of the Superior Court on count one of plaintiff's amended complaint in favor of the defendant Harry S. Feldman and against Anna Lee Lipscomb is affirmed.

The second count was by the plaintiff individually and as administratrix against Albert Coppage for killing Judge Lipscomb and shooting Anna Lee Lipscomb. Albert Coppage was dismissed out of the case by the court on its own motion, and count two will not be considered here.

Count three of the complaint sets out an action by the plaintiff, individually, for personal injuries, as well as a wrongful death action for the death of Judge Lipscomb brought as administratrix of his estate. Among other things it alleges that the plaintiff and her husband were present in the tavern on April 30, 1955; that one Jessie Lester was in charge of the tavern on behalf of defendant Feldman; that the Lipscombs were in the exercise of due care and caution for their safety; that the duly authorized agent and servant of the defendant Feldman was then and there on duty or in charge of the tavern in Feldman's behalf and that defendant Feldman was "then and there under a duty to exercise due care and caution to see that persons in said tavern and dramshop conduct themselves properly with reference to the safety of others, that they did not become boisterous, quarrelsome and/or violent or likely to inflict injury on the patrons of the said tavern"; that defendant Feldman and Lester, in disregard of their duty, permitted Coppage to become "intoxicated, quarrelsome, violent and boisterous" and permitted him to be in and about the tavern displaying a loaded revolver and pointing or aiming the pistol at the plaintiff's intestate and at the plaintiff; and that Feldman and Lester either knew

or in the exercise of reasonable care should have known of the violent, quarrelsome and intemperate conduct of Coppage. The complaint then alleges the assault on the plaintiff and plaintiff's intestate. It further alleges that it was the duty of Feldman and Lester to have ejected Coppage and protected the plaintiff and plaintiff's intestate; and that they disregarded their duty and as a direct and proximate result thereof the plaintiff and her intestate were violently assaulted by Coppage.

The defendant filed an answer to all the counts in the complaint. In his answer to count three he admits the operation of the tavern, denies any duty owed by him, and in the alternative, that if he did owe any such duty he did not violate it. He denies that the plaintiff and plaintiff's intestate were exercising due care and caution for their own safety, and among other things denies that Coppage had a pistol on the premises which he was displaying to any person.

At the close of the trial the jury returned a verdict finding in favor of the plaintiff as administratrix of the estate of Judge Lipscomb, deceased, as to count three and against defendant Feldman, and assessing plaintiff's damages in the sum of $10,000. The jury also returned a verdict finding for the plaintiff, individually, as to count three and against the defendant Feldman, and assessing plaintiff's damages at $10,000. The court on the same day entered an order dismissing Lester and Coppage as defendants. The court entered judgments on the verdicts.

Defendant Feldman filed a post-trial motion in which he asks that the court enter judgment notwithstanding the verdict as to count three, and in that motion he alleges that the plaintiff's evidence failed to show that the defendant owed any duty to the deceased or to the plaintiff, that he did not violate any duty, and that the plaintiff's evidence was not

430g

sufficient to carry the case to the jury. In the post-trial motion he also moved in the alternative for a new trial, basing his motion, among other things, on the ground that the verdict was contrary to the "mani-fest [sic] weight of the evidence." Certain other ob-jections were made with reference to the introduction of evidence and to the giving and refusing of certain instructions. The court denied the post-trial motions and thereupon the defendant Feldman filed a notice of appeal.

In this court the defendant Feldman contends that he was not present nor was he responsible for any of the events which transpired on the day and place in question. It is his theory that the fatal shooting of Lipscomb took place outside the tavern some fifteen minutes or more after Coppage and Lipscomb had left the tavern, and that the wounding of plaintiff did take place in the tavern but was not foreseeable and the bartender, Lester, was in no position to have stopped the occurrence. The defendant asks this court either to enter a judgment notwithstanding the verdict or to reverse the judgment and remand the case for a new trial.

As we have pointed out in discussing the judg-ment which the court entered on count one of the complaint, no conference on instructions in the trial court appears in the record. Consequently we cannot under the authorities heretofore cited discuss any question concerning the giving or refusal to give in-structions. Nor can we consider the alleged errors of the court in sustaining objections to evidence offered by the defendant or improperly admitting evidence against him. The post-trial motion does not follow the rule that the only objections which this court can consider on review are those which were specifically set out in the post-trial motion. A mere statement that the court improperly sustained objections or improp-

erly admitted evidence is not sufficient. That practice was proper practice before the adoption of the Practice Act in 1933, as amended in 1955. These matters have been discussed in so many cases that it would seem that the eight-year period from the adoption of the amended Civil Practice Act in 1955 would be sufficient to permit even the most busy lawyer to acquaint himself with the statutory rules as interpreted by the courts of review. In Perez v. Baltimore & O. R. Co., 24 Ill App2d 204, 164 NE2d 209, we said:

> "In reference to his assertion that the trial court erred in admitting improper evidence, the plaintiff contends that paragraph 6 of his post-trial motion covers all errors of evidence raised on appeal. This paragraph is as follows: '6. The Court erred in admitting improper evidence offered by the defendant at the trial of said cause over the objection of the plaintiff.' The Civil Practice Act (68.1(2), ch 110, Ill Rev Stats 1959) states: 'The post-trial motion must contain the points relied upon, particularly specifying the grounds in support thereof . . .' Paragraph 6 of the motion is a 'point relied upon' but it satisfies only one requirement of the statute. The paragraph is general. It does not meet the further requirement of 'particularly specifying the grounds in support thereof.' The word 'particularly' is opposed to generality. The word 'specifying' means to define in detail. Either one of these words would suffice to show what is needed. The combination of both of them emphasizes the necessity of itemizing the grounds supporting the points advanced in a post-trial motion. A trial judge should have an opportunity to appraise the errors which are asserted to have taken place. It is unfair to charge him with errors in a reviewing court without having brought them to his atten-

tion so that a new trial could have been granted if he found it advisable. Illinois Cent. R. Co. v. Johnson, 191 Ill 594; Pajak v. Mamsch, 338 Ill App 337."

Also see McCormack v. Haan, 23 Ill App2d 87, 161 NE 2d 599. Consequently there are only two questions before this court.

The first question is, Did the court err in denying judgment notwithstanding the verdict in favor of Feldman? That question can be disposed of very shortly. There was evidence in the record upon which a jury might properly infer that defendant Feldman was responsible for the occurrences in question.

The second question is, Was the judgment against the manifest weight of the evidence? As we have pointed out in Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 180 NE2d 347, a reviewing court is not authorized to disturb the verdict unless the verdict and judgment are against the manifest weight of the evidence, citing and quoting from Read v. Cummings, 324 Ill App 607, 59 NE2d 325, where the court says that the reviewing court must take into consideration not only the verdict of the jury but the fact that the trial judge saw and heard the witnesses in overruling the motion for a new trial and entering judgment. Also see Valant v. Metropolitan Life Ins. Co., 302 Ill App 196, 23 NE2d 922; Sears, Roebuck & Co. v. Mears Slayton Lumber Co., 226 Ill App 287; Mokrzycki v. Olson Rug Co., 28 Ill App2d 117, 170 NE2d 635. In the Vasic case we said: "In order for the court to determine that the verdict is against the manifest weight of the evidence an opposite conclusion must be clearly evident or the jury's verdict palpably erroneous and wholly unwarranted from the manifest weight of the evidence. Benkowsky v. Chicago Transit Authority, 28 Ill App2d 257, 171 NE2d 416. A verdict

will not be set aside merely because the jury could have found differently or because judges feel that other conclusions would be more reasonable. Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836."

The evidence in this case was in sharp conflict. There is no question that at the time of the occurrence Feldman, the owner of the tavern, was not present. Three bartenders were supposed to work at the tavern that night, Lester, Coppage and Armsted. Lester at the time of the initial altercation between the Lipscombs and a third party was behind the bar in the tavern. Coppage himself testified that after he had told Lipscomb that he had to leave the tavern he, Coppage, went to the end of the bar, took his pistol from a "burglar alarm box" and put it in his pocket. He also testified that each day he brought the pistol to the tavern and at night he would take it home. Feldman testified that Coppage was supposed to work as a bartender until two o'clock. Feldman further testified that he did not keep any guns in the tavern; that he did not know that Coppage had a gun there; that there was a rule that bartenders should not drink with customers or buyers; that he, Feldman, knew that Coppage owned a gun; and that he did not make any inquiry as to whether Coppage or any of the other bartenders had a gun on the premises.

The plaintiff, together with two other witnesses, testified that prior to the initial dispute and at the time when she and her husband entered the tavern, Coppage was behind the bar and he and another customer had a glass apiece and were drinking from a bottle of whiskey, and that Coppage had four or five drinks and later started to serve other people at the bar. James M. Lipscomb testified that Lester had served the liquor to Coppage. Robert Tapplar testified that Coppage after the shooting had a distinct odor of alcohol on his breath. Coppage denied that

430k

he had been drinking that evening. Lester also testified that he had not seen Coppage take any drinks.

While apparently the interrogatories submitted to the jury with reference to the sobriety of Coppage were directed to the first count, it would seem that they would also be controlling as to the third count of the complaint. However this court finds that it was proper for the jury to consider the conflicting evidence with reference to Coppage's drinking even though they found that he had not become intoxicated.

The evidence is also in sharp conflict as to what occurred at and immediately prior to the fatal shooting of Lipscomb. Coppage testified that he worked from six o'clock until closing time, that closing time was two o'clock, and sometimes on Wednesdays they closed at twelve and one o'clock. Some dispute apparently resulted because of the conduct of a third person in the tavern. The plaintiff said that the third person was the aggressor; Coppage says that the plaintiff had encouraged the third person to take liberties with her. In any case a quarrel resulted between Lipscomb and Coppage, and Coppage ordered Lipscomb to leave the tavern.

Coppage testified that at about one o'clock Lipscomb left the tavern and two or three minutes after that Coppage left; that Lipscomb got into a car and drove away; that the plaintiff was inside the tavern talking to Lester; that at the time he, Coppage, was wearing his white bartender's apron; that he went out of the tavern, went to a car in which his wife was sitting, and drove around the block; that he returned to the front of the tavern five minutes later; that Lipscomb in his car pulled up behind him; and that he (Lipscomb) had with him his son-in-law and brother.

The plaintiff on the other hand testified that she and her husband had started out the door when Lester

430-1

called to her and she stopped to talk to him; that her husband walked outside and was standing outside; that Coppage walked out the door and came back in a car with his wife in about ten or fifteen minutes; that at the time when he got out of the car he had a gun in his hand; that he walked inside the tavern, "two feet inside of the door"; that she turned around and Coppage called to her husband and profanely told him to come into the tavern and that if he did not come in he would so handle the plaintiff that Lipscomb would have wished that he had come in; that Coppage then drew his gun, fired three shots, and her husband fell, and that at the time her husband had no weapon in his hands or visible on his person. The testimony of James M. Lipscomb and Robert Tapplar is of the same tenor.

Lester testified that after the first quarrel with Lipscomb, Coppage was putting beer in the cooler and that he then told him (Lipscomb) that if he waited until he stocked up the beer "he would take care of him"; that after he had finished with the beer he went to the fire alarm box and reached down; and that he (Lester) could not see what Coppage got out of the box. Lipscomb had walked out of the tavern and it was ten or twenty minutes before Coppage walked out. Later he saw Coppage getting out of his car at the curb and during that period Lipscomb was on the outside some place and the plaintiff was inside talking to him. He testified that he saw Coppage pass by Lipscomb and come into the tavern and that he said to Lipscomb he was ready for him and that he saw guns in both Coppage's and Lipscomb's hands.

Anna Lipscomb testified that after her husband was shot Coppage left the tavern, went to where her husband was lying, pointed his gun at her son and told him not to move Lipscomb; that Coppage then returned to the tavern and profanely said that he had

430m

got Lipscomb and that he was going to get her; that he walked over, whirled her around and shot once and missed her, and the second time shot her through the ear and down the neck and the bullet went in her shoulder; that Lester had said, when Coppage got back in the tavern, he was going to call the police. After she was shot Lester did call the police and the police got there in about five minutes.

Coppage testified that he saw the plaintiff take a gun from her handbag and give it to her husband while he was in the tavern. The jury were entitled to consider this testimony along with the testimony of the police officer. The plaintiff denied giving any gun to her husband, and said that at the time she had neither a gun nor a handbag.

Lester testified that after the shooting he took the gun from Coppage and that Coppage went out and came back with a gun in his hand and said, "This is my evidence," and he took a piece of newspaper off the bar and wrapped the gun in it. He also testified that after the police were called they arrived in about five minutes.

Coppage testified that after he got out of his car Lipscomb got out of his car and said to him that he, Lipscomb, was going to kill him; that he (Lipscomb) snapped his pistol in his (Coppage's) face twice and that he, Coppage, then shot him; that he then came back in the tavern. Coppage also testified that after he left his car and before the shooting he had re-entered the tavern and that he pointed his pistol at the plaintiff's son; that she then started the tussle with him and the pistol went off and shot her. He also testified that he had been standing in the tavern at the time he shot Lipscomb and that he immediately went out and got Lipscomb's pistol, brought it into the tavern, wrapped it in a piece of paper and handed the gun to Lester. Lipscomb was taken to the hospital

and the police took Coppage into custody. All witnesses agree that, at the time the shots were fired which killed Lipscomb, Coppage was inside the door of the tavern.

Several police officers testified. One of them, Officer Goebel, testified that he had talked to Coppage at the tavern and that in his opinion Coppage was sober; that he looked at the guns, one had been recently fired and the other one had two shells which were dented but had not exploded. The next morning with another officer he talked to Lipscomb in the hospital and asked him if he had a gun. Lipscomb first said he had not, and then he said he did. On cross-examination the officer testified that at the coroner's inquest he had said that Lipscomb had told him that he owned a gun and had it with him that night but that he did not take it out of his pocket. The officer on cross-examination testified that there was no notation in the report with reference to the sobriety of Coppage, nor was there anything in the report with reference to the dented shells in the other gun; and that he did not get a complete statement at the time from Coppage, nor did he ever subsequently attempt to get a statement.

Officer Hill testified that at the time Coppage was sober. His testimony with reference to Lipscomb's statement is the same as that of Goebel's. He also testified that when he came to the tavern two guns were given to him. The testimony of Officer Smith was generally to the same effect, and he said that in his opinion Coppage was in a condition to give a statement.

Officer Joachim testified that he entered the tavern with Officer Manzella; that the man behind the bar turned two guns over to Manzella; that the man who gave Manzella the guns was Coppage; and that Coppage at the time was in his opinion normal and not

under the influence of liquor. On cross-examination David Alswang, the attorney for the plaintiff, asked Joachim if he had not told him sometime previously that he (Joachim) wanted to see all the records and that he would testify that in his opinion Coppage was drunk. Joachim denied that he made any such statement. David Alswang then took the stand and testified that Officer Joachim had told him in their prior conversation that Coppage was drunk, and that on the day of the trial Joachim had told him that Coppage showed signs of having been drinking but that he would not testify he was drunk because that was a question only a medical man could answer.

There is a duty resting upon a proprietor of a tavern to see that his guests are free from annoyance or injury. It is similar and falls within the same category as the duty resting upon innkeepers at common law. Ordinarily the courts have held that reasonable care should be exercised to insure their safety. In one case in Illinois it has been held that an innkeeper is responsible for a "high degree of care" to prevent injury to his guest. Fortney v. Hotel Bancroft, Inc., 5 Ill App2d 327, 125 NE2d 544. See also 21 ILP Innkeepers, sec 6.

When a person employs an agent to transact business for him he is responsible for any act of the agent performed in the course of his duty. "The maxim of respondeat superior is founded on the principle that he who expects to derive advantage from an act which is done by another for him must answer for any injury which another may sustain from it." Barker v. Chicago, P. & St. L. R. Co., 243 Ill 482, 488, 90 NE 1057, 1059. Under that doctrine the master is responsible for negligent acts of his servant or agent while acting within the scope of his employment. Laver v. Kingston, 11 Ill App2d 323, 137 NE2d 113.

The case before us is not well pleaded. However in count three of the complaint there is sufficient alleged to bring it within the above stated principles. The doctrine of respondeat superior is invoked only as to the conduct of Lester. Defendant Feldman testified that he employed three bartenders, that there was nobody actually in charge when he was not there but that each man had his duty and his own work but that Lester closed the tavern and carried the keys. This testimony would be sufficient for the jury to infer that Lester, if he was not actually the manager, at least occupied a position somewhat akin to it in the absence of Feldman. There is testimony in the record that Lester had served Coppage intoxicating liquor in violation of the rule of the tavern, that he knew of the quarrel between Coppage and the deceased Lipscomb, that he saw Coppage go to the fire alarm box and go out of the tavern wearing his white apron before he was off duty, and that he delayed the departure of Lipscomb and his wife by engaging her in conversation. Lester at the trial testified that he did not know what, if anything, Coppage had taken from the fire alarm box. At the inquest he testified that he knew it was a gun which Coppage had put in his pocket. Whether we could consider this statement of Lester as something in the nature of an admission is not too material. The statement is sufficient to permit the jury to disregard Lester's testimony that he did not know that Coppage had a gun upon his person at the time he left the tavern. No explanation is given for Coppage's starting out in his car and returning to the tavern. The jury are of course the judges of the credibility of the witnesses. From the record before us some of the testimony of the police officers is of a character which might raise grave doubts as to credibility in the minds of the jurors.

430q

The circumstances brought out in the evidence would indicate a potentiality of violence which should have been apparent to Lester. Under those circumstances a duty would then devolve upon Lester to call the police, and a violation of that duty under the doctrine of respondeat superior could be laid upon the defendant Feldman. The testimony shows that after the police were called they got to the tavern in five minutes. If they had been called by Lester at the time when Coppage left the tavern this case would not be before us. The jury could have properly inferred from the evidence that Lester violated the duty which he owed to plaintiff and her husband on behalf of the defendant Feldman. If that duty was violated, then Feldman could properly be found guilty. The verdict of the jury is not against the manifest weight of the evidence. The trial court properly overruled the alternative motion of the defendant for a new trial as well as his motion for judgment notwithstanding the verdict.

The plaintiff made a motion in the trial court, supported by an affidavit of plaintiff's attorney, asking the court in accordance with section 41 of the Civil Practice Act (Ill Rev Stats c 110, § 41) to allow expenses and attorney's fees to the plaintiff because the defendant in his answer to count one of the complaint, while admitting the death of Lipscomb, denied that he died as a result of such assault. This motion the court denied. Section 41 of the Practice Act provides: "Allegations and denials, made without reasonable cause and not in good faith, and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee, to be summarily taxed by the court at the trial."

The case of McGourty v. Chiapetti, 38 Ill App2d 165, 186 NE2d 102, was cited by the plaintiff in support

430r

of her contention that the trial court improperly refused to entertain her motion for costs and attorney's fees. In that case the court discusses a statement of the attorney made in the trial of the case with reference to the pleadings. It is true that the case is not in sharp application to the case before us. To excuse his pleading in the instant case, defendant in his brief says that, while the court was correct in what it said in the McGourty case, it should "not be forgotten that the pressure of the tremendous pileup of litigation adversely affects the busy lawyers, perhaps even more than anyone else. Lawyers constantly on trial just cannot devote the time which should be spent on pleadings and are driven into a habit of short denials, which tends to be overworked." The answer to that argument is that when an attorney becomes so busy that he cannot properly plead and try his cases he should seek assistance. In the McGourty case we also said: "There is no longer any place for the general issue lawyer who denies everything so as to put his opponent to proof on every issue. The Civil Practice Act and the amendments thereto have been designed to avoid this." In Ready v. Ready, 33 Ill App2d 145, 178 NE2d 650, we affirmed the action of the trial court in allowing costs and attorney's fees and said: "Section 41 is an attempt of the legislature to penalize the litigant who pleads frivolous or false matters or brings a suit without any basis in law and thereby puts the burden upon his opponent to expend money for an attorney to make a defense against an untenable suit. The failure of the courts to apply the sanction provided in this section of the Practice Act has been frequently criticized by writers in the various law reviews."

The defendant also argues that it is impossible to tell whether the death of Lipscomb resulted from the shooting. Such an argument is in our opinion frivo-

lous. The trial court should have held a hearing, allowed the motion of the plaintiff, and entered an order imposing upon the defendant reasonable costs and attorney's fees under section 41.

The judgment of the Superior Court of Cook County on count one of the complaint in favor of defendant Harry S. Feldman is affirmed. The judgments of the trial court on count three of the complaint in favor of Anna Lee Lipscomb, individually and as administratrix of the estate of Judge Lipscomb, deceased, against Harry S. Feldman are affirmed. Insofar as the order of the trial court denied plaintiff's motion under section 41 for costs and attorney's fees it is reversed, and the cause is remanded to the trial court with directions to hold a hearing on said motion and enter an order allowing costs and attorney's fees as provided in section 41 of the Practice Act.

*Affirmed in part, reversed in part and cause remanded with directions.*

SCHWARTZ, P. J. and DEMPSEY, J., concur.